UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------

In re:                        )      Chapter 15 Case No. 07-12383 (BRL)

)

BEAR STEARNS HIGH-GRADE    )
STRUCTURED CREDIT STRATEGIES  )
MASTER FUND, LTD.             )      Civil Case No. 07-8730 (RWS)
(IN PROVISIONAL LIQUIDATION)  )

)

Debtor in a Foreign Proceeding and )
      Appellant.               )

)

-------------------------------------------------)

In re:                        )      Chapter 15 Case No. 07-12384 (BRL)

)

BEAR STEARNS HIGH-GRADE    )
STRUCTURED CREDIT STRATEGIES  )
ENHANCED LEVERAGE MASTER   )
FUND, LTD.                  )      Civil Case No. 07-8746 (RWS)
(IN PROVISIONAL LIQUIDATION)  )

)

Debtor in a Foreign Proceeding and )
      Appellant.               )

)

-------------------------------------------------)

## BRIEF OF AMICI CURIAE

Professor Jay L. Westbrook, *pro hac vice pending*
University of Texas
School of Law
727 East Dean Keeton Street
Austin, Texas 78705-3224

Daniel M. Glosband (DG-1944)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109

Professor Kenneth N. Klee (KK-5910)
UCLA School of Law
405 Hilgard Avenue
Law Building 1242
Los Angeles, California 90095-1476

November 28, 2007

LIBC/3162980.6

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.   STANDARD OF REVIEW .......................................................................1

III.  FACTS .....................................................................................................1

IV.   ARGUMENT ...........................................................................................1

    A.   The Record ......................................................................................1

    B.   Basic Mechanics of Chapter 15 .....................................................1

    C.   Eligibility requirements for Chapter 15 Recognition.....................1

    D.   Proof of eligibility..........................................................................1

        1.   Plain Meaning ......................................................................1

        2.   Legislative History ..............................................................1

    E.   Congress intended only a rebuttable evidentiary "presumption" ................1

    F.   The section 1516 presumption is no more powerful than other
        rebuttable evidentiary presumptions ..............................................1

    G.   Neither of the Foreign Proceedings is a foreign main proceeding
        because the Foreign Debtors' center of main interests is in the
        United States ....................................................................................1

    H.   Nonmain Proceedings – The Lack of an Establishment in the
        Islands .............................................................................................1

        1.   Context.................................................................................1

        2.   Plain Meaning ......................................................................1

        3.   Lack of possible relief.........................................................1

        4.   Policy ...................................................................................1

V.    CONCLUSION.........................................................................................1

EXHIBIT A........................................................................................................1

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bercovici v. Secretary of Health and Human Services,*
    1994 WL 39027 (S.D.N.Y. Feb 9, 1994) (Sweet, J.)................................................9

*Boatswain v. Gonzales,*
    414 F.3d 413 (2d Cir. 2005)................................................16

*Campbell v. Cantor Fitzgerald & Co., Inc.,*
    205 F.3d 1321, 1999 WL 1424999 (2d Cir. Dec. 23, 1999)................................................9

*Caputo v. Pfizer, Inc.,*
    267 F.3d 181 (2d Cir. 2001)................................................16

*Connecticut Nat. Bank v. Germain,*
    503 U.S. 249 (1992)................................................16

*County Court of Ulster County v. Allen,*
    442 U.S. 140 (1979)................................................21

*Eng v. New York Hosp.,*
    199 F.3d 1322, 1999 WL 980963 (2d Cir. Sep. 30, 1999)................................................9

*Fox v. Board of Trustees,*
    42 F.3d 135 (2d Cir. 1994)................................................9

*In re Ames Dept. Stores, Inc.,*
    320 B.R. 518 (Bankr. S.D.N.Y. 2005)................................................9-10

*In re McLean Industries, Inc.,*
    76 B.R. 291 (Bankr. S.D.N.Y. 1986)................................................29

*In re Food Fair, Inc.,*
    15 B.R. 569 (Bankr. S.D.N.Y. 1981)................................................10

*In re SPhinX, Ltd.,*
    351 B.R. 103 (Bankr. S.D.N.Y. 2006)................................................Passim

*In re SPhinX, Ltd.,*
    371 B.R. 10 (S.D.N.Y. 2007)................................................5, 9

*In re Tri-Continental Exchange Ltd.,*
    349 B.R. 627 (Bankr. E.D. Cal. 2006)................................................Passim

*Kilian v. Stackpole Sons, Inc.,*
    98 F.Supp. 500 (M.D. Pa. 1951)................................................22

*Newspaper and Mail Deliverers' Union of New York and Vicinity v. Imperial News Co., Inc.,*
1992 WL 47337 (S.D.N.Y. Feb. 28, 1992) ............................................................9

*Payton v. City University of New York,*
2007 WL 60515 (S.D.N.Y. Jan. 8, 2007) (Sweet, J.) ...........................................9

*Salinger v. Random House, Inc.,*
818 F.2d 252 (2d Cir. 1987) ..................................................................................9

*Schaffer ex rel. Schaffer v. Weast,*
546 U.S. 49 (2005) ................................................................................................21

*St. Mary's Honor Ctr. v. Hicks,*
509 U.S. 502 (1993) .........................................................................................21-22

*U.S. v. DiTomasso,*
817 F.2d 201 (2d Cir. 1987) ................................................................................22

*U.S. v. Marzano,*
149 F.2d 923 (2d Cir. 1945) ................................................................................30

*U. S. v. Moore,*
571 F.2d 76 (2d Cir. 1978) ....................................................................................9

**FOREIGN CASES**

Case C-341/04, *In re Eurofood IFSC Ltd.,* 2006 E.C.R. I-3813 ....................... 19, 24-26

*In re Daisytek-ISA Ltd.,*
[2003] All E.R. (D) 312 (Ch. May 16, 2003) (McGonigal, J.) ...........................26

*SAS ISA Daisytek,* [CA] [regional court of appeal] Versailles, Sept. 4, 2003,
05038..................................................................................................................26

**STATUTES**

11 U.S.C. § 101(23) ...................................................................................... 10, 12-13

11 U.S.C. § 101(24) ........................................................................................... 11-12

11 U.S.C. § 304 (repealed 2005)........................................................................ Passim

11 U.S.C. § 362 ...........................................................................................................15

11 U.S.C. § 1501 ...........................................................................................................2

11 U.S.C. § 1502 ............................................................................................16, 23, 28

LIBC/3162980.6

11 U.S.C. § 1502(2) ................................................................................5, 11, 27

11 U.S.C. § 1502(4) ................................................................................ 11-12

11 U.S.C. § 1502(5) ................................................................................ 11-12, 27

11 U.S.C. § 1502(7) ................................................................................11

11 U.S.C. § 1503(2) ................................................................................5

11 U.S.C. § 1504 ................................................................................10

11 U.S.C. § 1507(b) ................................................................................3

11 U.S.C. § 1508 ................................................................................1

11 U.S.C. § 1509 ................................................................................10, 17

11 U.S.C. § 1509(b) ................................................................................4, 17

11 U.S.C. § 1509(d) ................................................................................17

11 U.S.C. § 1509(f) ................................................................................3

11 U.S.C. § 1515 ................................................................................10, 12, 16, 26

11 U.S.C. § 1515(b) ................................................................................10

11 U.S.C. § 1516 ................................................................................10, 16

11 U.S.C. § 1516(a) ................................................................................11

11 U.S.C. § 1516(c) ................................................................................ 19-21

11 U.S.C. § 1517 ................................................................................Passim

11 U.S.C. § 1519 ................................................................................3, 15

11 U.S.C. § 1520 ................................................................................3, 15

11 U.S.C. § 1521 ................................................................................3, 15

11 U.S.C. § 1521(c) ................................................................................ 5, 15, 28-29

11 U.S.C. § 1523 ................................................................................15

11 U.S.C. § 1525 ................................................................................3

11 U.S.C. § 1528 ................................................................................15

LIBC/3162980.6

11 U.S.C. § 1530 ..................................................................................................15

28 U.S.C. § 1334(e) 1 .........................................................................................29

29 Fed. Prac. & Proc. Evid. § 6232 ...................................................................22

Bankr. Rule 8006 ..................................................................................................9

*Bankruptcy Reform Act of 1999 (Part III): Heaering before the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary, 106th Cong. 343-46 (1999)* ..................................................................................2

Fed. R. App. P. 10 ...........................................................................................9-10

Fed. R. Bankr. Proc. 8013 ..................................................................................30

Fed. R. Evid. 301 ................................................................................................21

Fed. R. Evid. 614 ................................................................................................22

H.R. Rep. No. 109-31 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88 ......................Passim

OTHER AUTHORITIES

10 Collier on Bankruptcy ¶ 8006.03 (15th ed. rev. 2005) ...............................9-10

106th Cong. 343-46 (1999) (statement of Tina Brozman, Chief United States Bankr. J. S.D.N.Y.) ...................................................................................3

29 Am. Jur. 2d *Evidence* § 158 (2007) ...............................................................22

Black's Law Dictionary 586 (8th ed. 1999) ........................................................28

C. Mueller & L. Kirkpatrick, Evidence § 3.1, p. 104 (3d ed. 2003) ...................21

Cochit & Poehner, Fed. Courtroom Evid. § 301 (5th ed. 2007) .........................21

Council Regulation (EC) No 1346/2000 of 29 May 2000 on Insolvency Proceedings, Off. J. L. 160/1 (2000) .......................................................19, 23

Elizabeth Warren & Jay Lawrence Westbrook, Chapter 11: Conventional Wisdom and Reality, Social Science Research Network ......................................30

Elizabeth Warren & Jay Lawrence Westbrook, The Law of Debtors and Creditors, Chapter 10 (5th Ed. 2006) ......................................................................29

Glosband, Daniel M., *SPhinX Chapter 15 Opinion Misses the Mark*, 25 Am. Bankr. Inst. J. 44 (December/January 2007) ................................................5

LIBC/3162980.6

Jay Westbrook, *Chapter 15 at Last*, 79 Am. Bankr. L.J. 713, 719 (2005) .....................................2

Jed Horowitz, *Groups Fight for Data on Failed Bear Stearns Funds*,  Dow Jones
    Newswires, Nov. 4, 2007 ..............................................................................................8

Jennifer Levitz, *Bear Stearns Draws Probe on Fund Trades*, Wall St. J., Oct. 19,
    2007..........................................................................................................................8

Jennifer Levitz, *Massachusetts Regulators Accuse Bear Stearns of Fraud*, Wall
    St. J., Nov. 14, 2007.................................................................................................8

National Bankruptcy Review Commission, Bankruptcy: The Next Twenty Years,
    Final Report (1997).................................................................................................2

The Cross Border Insolvency Regulations, 2006 S.I. 2006/1030 (U.K.) .....................................30

Thomas Salerno & Jordan Kroop, Bankruptcy Litigation And Practice: A
    Practitioner's Guide, § 1.03 (3d Ed. Aspen 2006) ......................................................2

UNCITRAL Guide to Enactment of the Model Law on Cross-Border Insolvency ............. Passim

UNCITRAL Model Law on Cross-Border Insolvency, art. 2(c) ...................................................27

UNCITRAL Model Law on Cross-Border Insolvency, art. 7 .........................................................3

UNCITRAL Model Law on Cross-Border Insolvency, art. 16 .....................................................20

UNCITRAL Model Law on Cross-Border Insolvency, art. 17 .......................................................3

UNCITRAL Model Law on Cross-Border Insolvency, art. 21 ....................................................3, 5

UNCITRAL Model Law on Cross-Border Insolvency, art. 25 .......................................................3

V Oxford English Dictionary, 405 (2d ed. 1989) .......................................................................28

Wright & Graham, 21B Fed. Prac. & Proc. Evid.2d § 5122 (2007)..............................................22

LIBC/3162980.6

## INTRODUCTION

The authors are filing this brief *amici curiae* to assist the court in its interpretation and application of a new statute with a significant international heritage and implications,[1] consistent with the requirements of § 1508 of the Bankruptcy Code, *Interpretation*:[2]

> In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions. [3]

The authors of this brief, Professor Jay L. Westbrook of the University of Texas School of Law, Daniel M. Glosband of Goodwin Procter LLP and Professor Kenneth N. Klee of the University of California at Los Angeles School of Law, have an abiding interest in cross-border insolvency law and the integrity of chapter 15 and of the United States Bankruptcy Code. Professor Westbrook and Mr. Glosband were part of the "small drafting group" that drafted the UNCITRAL Model Law on Cross-Border Insolvency[4] ("Model Law") and they then served as the primary draftsmen assisting the Department of State and the Congress in drafting chapter 15 of the Bankruptcy Code. They each have written extensively on chapter 15.[5]  Professor Klee, one of the draftsmen of the 1978 Code, assisted with the drafting of chapter 15 and its presentation to Congress.

---

[1] The Model Law has now been adopted by thirteen jurisdictions, including Japan, Mexico, and the United Kingdom. *See* http://www.uncitral.org/uncitral/en/uncitral_texts/insolvency/1997Model_status.html

[2] All statutory references are to title 11 of the United States Code (the "Bankruptcy Code") unless otherwise indicated.

[3] The House Report expands on this mandate: "This provision follows conceptually Model Law article 8 and is a standard one in recent UNCITRAL treaties and model laws. Changes to the language were made to express the concepts more clearly in United States vernacular. Interpretation of this chapter on a uniform basis will be aided by reference to the [UNCITRAL] Guide [to Enactment] and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well." H.R. Rep. No. 109-31, at 109 (2005), as reprinted in 2005 U.S.C.C.A.N. 88 (the "House Report").  The Model Law and the Guide to Enactment ("Guide") can be found at www.UNCITRAL.org under "UNCITRAL Texts & Status/Insolvency."  The full history of the Model Law is recounted in a series of reports of the UNCITRAL colloquia and the sessions of the Working Group on Insolvency Law that led to its adoption. These, in turn, are fully cited in the Guide to Enactment and also can be found on the UNCITRAL website, http://www.uncitral.org/uncitral/en/uncitral_texts/insolvency/1997Model.html.

[4] Professor Westbrook was the co-head of the United States delegation to the UNCITRAL conference and Mr. Glosband was the principal representative of the International Bar Association at those meetings.

[5] See Exhibit A for a bibliography of the authors' relevant publications.

1

# I.    PRELIMINARY STATEMENT

Shortly after the United Nations Commission on International Trade Law ("UNCITRAL") completed and approved the Model Law on Cross Border Insolvency (the "Model Law") in 1997, the National Bankruptcy Review Commission requested a presentation by United States lawyers and judges who had participated in the Colloquia and Working Group on Insolvency Law that developed the Model Law.  Following the presentation, the Commission unanimously recommended that the Model Law be adapted for inclusion in the Bankruptcy Code.[6]

A United States Working Group (the "U.S. Working Group") was formed by Harold S. Burman, Office of Legal Advisor in the State Department.[7]  The U.S. Working Group completed its draft of chapter 15 in 1999 and submitted it to the Committees on the Judiciary of the House of Representatives and the Senate.  *See* H.R. Jud. Comm., *Bankruptcy Reform Act of 1999*, 106th Cong. 343-46 (Mar. 18, 1999).  Although chapter 15 enjoyed almost unanimous bipartisan support, its enactment was delayed until its adoption as part of the legislation that became the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "2005 Act").  Jay Westbrook, *Chapter 15 at Last*, 79 Am. Bankr. L.J. 713, 719 (2005); Thomas Salerno & Jordan Kroop, Bankruptcy Litigation And Practice: A Practitioner's Guide, § 1.03 (3d ed. Aspen 2006).

Chapter 15 was added to the Bankruptcy Code by title VIII of the 2005 Act to encourage cooperation between the United States and foreign countries with respect to transnational insolvency cases.  § 1501.  This new chapter of the Bankruptcy Code incorporates the UNCITRAL Model Law.[8]  The House Report on the 2005 Act is the definitive legislative history.[9]  The House Report, in turn, points the courts to the Guide

---

[6] National Bankruptcy Review Commission, Bankruptcy: The Next Twenty Years, Final Report at Vol. 1, Chap. 2, Part 3 (1997).  ("NBRC Report").

[7] *Id.* at 351 n. 874.

[8] House Report, at 105-06.

[9] *Id.* at 109 n. 119.  The U.S. Working Group completed its draft of chapter 15 in 1999 and submitted it to the Committees on the Judiciary of the House of Representatives and the Senate. *See Bankruptcy Reform Act of 1999 (Part III): Hearing before the Subcomm. on Commerical and Administrative Law of the H.*

to Enactment of the Model Law ("Guide") published by UNCITRAL as an aid to enacting countries. *Id.* The Guide provides historical and interpretive guidance to the meaning and purpose of the provisions that are embodied in chapter 15.[10]

Chapter 15 and the Model Law are designed to provide access to the court system of a host country (the United States, in the case of chapter 15) by a representative of an insolvency proceeding that is pending in a foreign country. *See* § 1521; Model Law art. 21. If access is granted, then relief from the host country court may be available. *See* § 1521; Model Law art. 21.[11] "Recognition," the statutory parlance for such access, is distinct from the relief that may be granted post-recognition. Recognition turns on the strict application of objective criteria. *See* § 1517; Model Law art. 17. Conversely, relief is largely discretionary and turns on subjective factors that embody principles of comity. *See, e.g.*, §§ 1507(b), 1521, 1525; Model Law art. 7, 21, 25. The eligibility equirements for recognition are inflexible while the considerations for post-recognition relief are "flexible and pragmatic."[12]

Imposing recognition as a condition to nearly all court access and consequently as a condition to granting comity manifests a stark contrast between chapter 15 and its predecessor section 304.[13] Prior to the enactment of chapter 15, access to the United States courts by a foreign representative was not dependent on recognition, and all relief under section 304 was discretionary and based on subjective, comity-influenced factors. Subsection 304(c) specifically included restrictive factors that limited the grant of relief and thus importantly cabined the discretion given to the courts by that section.

---

*Comm. on the Judiciary*, 106th Cong. 343-46 (1999) (statement of Tina Brozman, Chief United States Bankr. J. S.D.N.Y.).

[10] House Report at 105-107, 109. See also *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 632 (Bankr. E.D. Cal., 2006). For the Guide, see
http://www.uncitral.org/uncitral/en/uncitral_texts/insolvency/1997Model.html

[11] Chapter 15 does have an emergency provision to grant provisional relief after the petition for recognition is filed, but only where such relief is "urgently needed to protect the assets of the debtor or the interests of the creditors," and even then only until recognition is granted or denied. § 1519.

[12] Appellants' Opening Brief ("AOB") uses the phrase "flexible and pragmatic" at 1. Some relief is automatic upon recognition of a foreign main proceeding. § 1520.

[13] A single exception to the recognition requirement permits a foreign representative to sue in a court in the United States to collect a claim that is property of the debtor without obtaining chapter 15 recognition. § 1509(f).

LIBC/3162980.6

The objective criteria for recognition reflect a legislative decision by UNCITRAL and by Congress that a foreign proceeding will not be entitled to access to or assistance from the host country courts unless the debtor had a sufficient pre-petition economic presence in the country of the foreign proceeding. House Report at 110; *see* § 1509(b)(3). If the debtor does not have its center of main interests ("COMI") or at least an establishment in the country of the foreign proceedings, the bankruptcy court should not grant recognition and is not authorized to use its power to effectuate the purposes of the foreign proceeding. *See* House Report at 113; Guide at ¶¶ 73, 75, 128. Implicitly, in such an instance the debtor's liquidation or reorganization should be taking place in a country other than the one in which the foreign proceeding was filed to be entitled to assistance from the United States.

In the within case, Simon Lovell Clayton Whicker and Kristen Beighton, the joint official liquidators and duly-authorized foreign representatives (the "Foreign Representatives") of Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (in Official Liquidation) and Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (in Official Liquidation) (collectively, the "Foreign Debtors"), sought chapter 15 recognition of winding–up proceedings of the Foreign Debtors pending in the Grand Court of the Cayman Islands (the "Foreign Proceedings") as a "main" proceeding. Recognition was denied and the Foreign Representatives have appealed that denial. In arguing for reversal, appellants attempt to circumvent the strict eligibility criteria for chapter 15 recognition by interpolating subjective factors – comity and flexibility – into an objective standard and by stretching the meaning of the terms "center of main interests" and "establishment" to encompass facts that fall short of their definitional requirements.

Appellants also suggest an alternative approach, seeking to use the lower entry threshold for recognition of a foreign "nonmain" proceeding to gain access to the United States courts. AOB at 32. The proposed alternative both debases the definitional requirements of a foreign nonmain proceeding and manifests a fundamental misunderstanding of the possible scope of a foreign nonmain proceeding. By definition,

4

the debtor in a foreign nonmain proceeding must have a place of operations (and implicitly assets as well) in the country of the foreign proceeding. § 1502(2). A foreign nonmain proceeding is itself a secondary proceeding. Any relief available to a representative of a foreign nonmain proceeding must be limited to assets that, under the law of the United States, should be administered in the foreign proceeding or to information required in that proceeding. § 1521(c). Model Law art. 21. Guide at ¶ 158. Appellants seek relief well in excess of that available to a foreign nonmain proceeding.

Appellants rely in part on the decisions of the bankruptcy court and this court in the *SPhinX* case.[14] Dicta in the bankruptcy court decision unfortunately misapplied the chapter 15 eligibility criteria and misperceived the purpose and scope of a foreign nonmain proceeding. *See* Glosband, Daniel M., *SPhinX Chapter 15 Opinion Misses the Mark*, 25 Am. Bankr. Inst. J. 44 (December/January 2007). The only issue on appeal to this court in *SPhinX* was the propriety of the bankruptcy court's refusal to recognize the foreign proceeding as a main proceeding. *SPhinX,* 371 B.R. at 17-19. No appeal was taken from its recognition of that proceeding as nonmain. In addition, the bankruptcy court did not have the benefit of the decision in *Tri-Continental* at the time it decided *SPhinX*.[15] In contrast to the dicta in *SPhinX,* the bankruptcy court in this case properly applied the chapter 15 eligibility criteria, determined on the record before it that the Foreign Debtors had neither their center of main interests nor an establishment (place of operations)[16] in the Cayman Islands and consequently denied recognition of the Foreign Proceedings as either foreign main proceedings or foreign nonmain proceedings. Decision at 17-18.[17] It is important to emphasize that there is no inconsistency between the decision of the court below and the holding in *SPhinX* that refused to recognize the foreign proceeding in that case as a main proceeding.

---

[14] AOB at 3-4, 19, 20, 22-23, 26, 28, 30, 33, 35, 37, 39; *In re SPhinX, Ltd.* 351 B.R. 103 (Bankr. S.D.N.Y. 2006) and *In re SPhinX, Ltd.,* 371 B.R. 10 (S.D.N.Y. 2007).
[15] The *SPhinX* decision, *supra,* issued on September 6, 2006; the *Tri-Continental* decision, supra, issued on September 11, 2006.
[16] 11 U.S.C. § 1503(2).
[17] "Decision" references are to the Bankruptcy Court's "Amended Decision and Order Denying Recognition of Foreign Proceedings" of September 5, 2007.

5

## II.    STANDARD OF REVIEW

Amici subscribe to the standard of review set forth in Appellant's Opening Brief at page 5.

## III.    FACTS

The two hedge funds whose Cayman Island liquidators seek recognition in the United States in this case appear to be insolvent, although they may have substantial cash assets. Record on Appeal ("ROA")-9 at 22:12-15. The factual record is clear, but not rich, because of the liquidators' apparent belief that they were entitled to recognition without any real disclosure of the facts concerning the operations or current assets of the funds.[18]

It is not seriously contested that both of these hedge funds are in substance all-American companies. As found by the court below, their pleadings as well as the facts elicited at the hearings before the court place the conduct of the funds' business and their assets, along with their management company and sponsors, in New York City.[19] Decision at 3, 12-14 (citing ROA-2 at ¶¶ 1, 3, 9; ROA-9 at 13,22). "Upon information and belief, all of High-Grade Fund's assets are managed by BSAM [Bear Stearns Asset Management, Inc.] and are located within this [SDNY] judicial district." ROA-2 at 6:9; ROA-12 at 19:15-19 (admitting "most of the bank accounts for the operations of the funds were located at Bear Stearns pre-filing" and conceding that $7.5 million are still in United States bank accounts). Notably, all of High Grade Fund's investors were advised by the same investment advisor that advised the fund itself, Bear Stearns Asset Management, Inc. ROA-12 at 11:14-16; 23:22-25. The answers given to the court's questions by one of the Foreign Representatives concerning their base of operations and

---

[18] The one Foreign Representative who testified provided carefully limited answers to the court's questions. *E.g.*, ROA-12 at 24:8-21.

[19] *See* ROA-2 at ¶ 1,3,9. Even the post-hoc "record" appellant seeks to establish on appeal reveals more connections with other jurisdictions than with the Cayman Islands. ROA-11 at ¶ 28. Also, the routine administration of the fund is carried out by PFPC Inc. (Delaware), a Massachusetts corporation (the "Administrator") who conducted virtually all activity of the company not done by the investment manager, Bear Stearns Asset Management (a New York corporation). ROA-2 ¶ 3. PFPC Inc. also maintained the funds' shareholder lists and other records in Delaware. ROA-2 ¶ 3. The investment registries for the funds are maintained in Ireland. ROA-2 n.1.

6

decision making seems to clarify the true COMI of the investors.[20]  Lacking any claim to the contrary, it seems certain that the same thing is true of both Foreign Debtors.

Virtually the only connection the Foreign Debtors had with the Cayman Islands as of the date of the petition lay in their articles of incorporation and a few technical activities[21] required to establish and maintain incorporation in that jurisdiction.[22] Decision at 12, (citing ROA-2 at ¶ 2).  The debtors did not have any employees or managers in the Cayman Islands. [23]  Decision at 13.

As Judge Lifland noted, the funds are "exempted" companies, a status under Cayman Islands law that severely limits their activities in the Islands.  Decision at 15 (citing Companies Law (2004 Revision) of the Cayman Islands § 193).  No evidence has been offered to suggest that any investor or creditor of the funds knew or had reason to know of their Cayman Islands incorporation or of any location of the funds other than at the New York offices of Bear Stearns Asset Management ("BSAM"),  the investment manager to the funds and a New York corporate affiliate of the famous New York investment bank and brokerage firm, The Bear Stearns Companies, Inc.

This amici brief is focused upon the proper construction of chapter 15 of the Bankruptcy Code, so it does not discuss the facts in detail.  Nonetheless, as discussed below, the funds defy important principles of appellate review by attempting to create on appeal the factual record they failed to make before Judge Lifland.  For example, the appellants make much of an alleged requirement that two local directors pass on

---

[20] ROA-12 at 24:8-21.

[21] The appellants say that "certain auditing" activities took place in the islands, whatever "certain" might encompass.  ROA-11 at 11 (citing ROA-2 at 18:13-15).

[22] Apparently, prior to filing the Chapter 15 Petition, all of the Foreign Debtors' funds were maintained in its accounts with its prime broker in the United States.  ROA-2 at ¶ 6. Post-filing, some millions of dollars in cash were directed to accounts in the Cayman Islands instead of their usual destination in the United States.  Decision at 13; ROA-9 at 22:5-22; ROA-12 at 17-19.  The court below was understandably troubled by this transfer of cash out of the reach of United States creditors without notice to the United States bankruptcy court from which the petitioners sought and obtained protection from creditors by way of a temporary injunction.  Transcript of Hearing on Motion for Stay Pending Appeal, September 24, 2007 ("September 24 Transcript"), p.8, pp.10-11 (while not part of the ROA, Appellants have evidently submitted this transcript s part of an "Addendum" volume).

[23] Though two of the directors of the funds did reside in the Cayman Islands.  Decision at 13 n. 9 (citation omitted).  But the level of involvement of these directors has come into serious question.  Infra n.23.

LIBC/3162980.6

transactions with the funds, AOB at 15, 34 n.21, although there is no evidence that this requirement was fulfilled in fact[24] or would have amounted to more than a pro forma technicality.  However, the affidavit that is the basis for Appellants' assertion was submitted after the Decision issued, as support for their Motion for Stay Pending Appeal and is not part of the record.  AOB at 14-15.

The other newly alleged activities in the Cayman Islands are even more technical. One is that as Cayman Island incorporated companies, the funds are "required" to be wound up in the Cayman Islands.  The other is that upon appointment of the joint provisional liquidators, the powers of the boards of directors ceased and the control of the Foreign Debtors was transferred to Cayman Islands.[25]  AOB at 12.  Neither of these amounts to a claim of any substantive economic activity in the Cayman Islands.

Although various factual claims are made by the appellant about the expense and burden of a United States bankruptcy case, AOB at 10, no factual evidence is offered about the supposed burden and expense of American bankruptcy proceedings or the expense and delays associated with liquidation cases in the Cayman Islands.  The Court may take notice of the fact that United States courts in general, and the bankruptcy courts in particular, are widely regarded as among the best in the world.

---

[24] Indeed, a recent article about a Securities Exchange Commission investigation suggests that the "independent" local directors may not in fact have been consulted as they supposedly should have been. Jennifer Levitz, *Bear Stearns Draws Probe on Fund Trades*, Wall St. J., Oct. 19, 2007.  The record does not show the directors' occupations, expertise, or connections with Bear, Stearns in New York.  It appears that they were employees of Walkers Fund Services.  Jennifer Levitz, *Massachusetts Regulators Accuse Bear Stearns of Fraud*, Wall St. J., Nov. 14, 2007.  The employer of the independent directors and Walkers, the Foreign Debtors' Cayman counsel (ROA-2, Ex. A) are affiliates in The Walkers Group (http://www.walkersglobal.com/).  None of these points was tested below because none of this evidence was offered to the bankruptcy court.

[25] The appellants even mention that some investments of the funds were governed by Cayman Islands law. AOB at 2; ROA-11 at ¶ 27.  The Enhanced Leverage Fund "has only one investor, which is a large financial institution based in the United Kingdom."  ROA-9 at 18:4-7.  The High-Grade fund "has only three investors, *all Bear Stearns entities*, two of which are registered in the Cayman Islands, and one of which is a U.S. entity."  *Id*. at 18:1-4 (emphasis added).  We are not told where the Cayman Islands incorporated investors do business or where they dealt with these debtors, though arguably that would be in New York.  ROA-12 at 24:1-21.  The apparent reason for the limited number of investors is that the Foreign Debtors were master funds and the larger universe of investors were at the feeder funds that fed into these.  Jed Horowitz, *Groups Fight for Data on Failed Bear Stearns Funds*, Dow Jones Newswires, Nov. 4, 2007, p. 2.

8

# IV.    ARGUMENT

## A.    The Record

Although the Foreign Representatives were present at the hearing on the merits before Judge Lifland, they offered no evidence of any substantial business activity by the Foreign Debtors in the Cayman Islands, but they conceded that virtually all of the important activities of the fund were carried out in New York.[26]  Instead, on appeal they attempt to introduce new though still insufficient evidence to support their claims.

It is hornbook law that these appellants should not ambush the judge below by offering evidence only after the hearing on the merits.[27]  It may be that the appellants had hoped that they could rely on the dicta in *SPhinX* (351 B.R. at 120-121; 371 B.R. at 10) while ignoring the interpretation offered by the holding of *Tri-Continental* (349 B.R. at 640).[28]  Instead, they could and should have been prepared to address the evidentiary issues apparent on the face of the statute when the court requested they do so.  Their post-hoc attempt to provide evidence  is as procedurally invalid as it is substantively inadequate.[29]

---

[26] Decision at 12-13; ROA-2 at ¶¶ 1, 3, 9; ROA-12 at 24:1-5.

[27] The record on appeal is governed by Bankr. R. 8006.  "[T]he touchstone for the designation of matter as part of the record is whether the matter was before the lower court (or at least considered by that court) in entering the order or judgment appealed from.  *In re Ames Dept. Stores, Inc.*, 320 B.R. 518, 522 (Bankr.S.D.N.Y. 2005).  "[I]f an item was not considered by the court, it should be stricken from the record on appeal."  *Id.* at 521 (quotations omitted).

 Commentators suggest looking to decisions under Fed. R. App. P. 10 for guidelines to understanding Rule 8006.  10 Collier on Bankruptcy ¶ 8006.03 (15th ed. rev. 2005).  The purpose of Rule 10 is to permit correction of the record so that it reflects only what was considered by the district court.  *See, e.g., Fox v. Board of Trustees*, 42 F.3d 135, 143 (2d Cir. 1994); *Salinger v. Random House, Inc.*, 818 F.2d 252, 253 (2d Cir. 1987) (supplementing record to clarify "understanding of the process by which the District Judge reached the decision challenged on appeal"); *U. S. v. Moore*, 571 F.2d 76, 87 n.10 (2d Cir. 1978); *Campbell v. Cantor Fitzgerald & Co., Inc.*, 205 F.3d 1321, 1999 WL 1424999, at *2 (2d Cir. Dec. 23, 1999); *Eng v. New York Hosp.*, 199 F.3d 1322, 1999 WL 980963, at *1 (2d Cir. Sep. 30, 1999).

 This Court itself has repeatedly stated Rule 10(e) does not allow "'add[ing] to the record on appeal matters that did not occur there in the course of proceedings leading to the judgment under review.'"  *E.g., Payton v. City University of New York*, 2007 WL 60515, at *1 (S.D.N.Y. Jan. 8, 2007) (Sweet, J.); *Bercovici v. Secretary of Health and Human Services*, 1994 WL 39027, at *1 (S.D.N.Y. Feb 9, 1994) (Sweet, J.).

[28] *SPhinX*, 351 B.R. at 120-121; 371 B.R. at 10; *Tri-Continental* was decided about a week after the date of the opinion in *SPhinX*.

[29] *Newspaper and Mail Deliverers' Union of New York and Vicinity v. Imperial News Co., Inc.*, 1992 WL 47337, at *1 (S.D.N.Y. Feb. 28, 1992) (refusing to include in the record documents available at the time of the bankruptcy proceeding but not offered;  suggesting that only extraordinary circumstances warrant

**B.     Basic Mechanics of Chapter 15**

Section 1504, entitled ***Commencement of ancillary case*** provides that a chapter 15 case ancillary to a foreign proceeding is commenced by filing a petition.[30]  Section 1509 permits the foreign representative to file the petition directly with the Bankruptcy Court, without need for preliminary formalities, but then conditions any other court access by the foreign representative on recognition.[31] Sections 1504 and 1509 direct the foreign representative to file a petition for recognition of a foreign proceeding pursuant to section 1515.  Section 1515 sets forth requirements for documentary or other evidence that demonstrates the existence of the foreign proceeding and the appointment of the foreign representative.[32]  Section 1516 permits the bankruptcy court to presume that the materials accompanying the petition demonstrate that the foreign proceeding and the foreign representative meet the basic definitional requirements.[33]

---

inclusion of new evidence); *In re Ames*, 320 B.R. at 522 (striking items not designated in record, never filed with bankruptcy court, and never considered by bankruptcy court).  The proper procedure to correct or modify a record on appeal is to file a motion per Appellate Rule 10(e), which has been held applicable to bankruptcy proceedings for such purposes.  *See In re Food Fair, Inc.*, 15 B.R. 569, 571 (Bankr. S.D.N.Y. 1981) (citing *In re W.T. Grant*, 432 F.Supp. 105 (S.D.N.Y. 1977); *In re Saco Local Development Corp.*, 13 B.R. 226 (Bankr. D. Me. 1981)).

[30] "The title "ancillary" in the title of this section and in the title of this chapter emphasizes the United States policy in favor of a general rule that countries other than the home country of the debtor, where a main proceeding would be brought, should usually act through ancillary proceedings in aid of the main proceedings, in preference to a system of full bankruptcies (often called "secondary" proceedings) in each state where assets are found." 10 Collier on Bankruptcy ¶ 8006.03 (15th ed. rev. 2005).

[31] "If recognition is granted, the foreign representative will have full capacity under United States law (subsection (b)(1)), may request such relief in a state or Federal court other than the bankruptcy court (subsection (b)(2)), and shall be granted comity or cooperation by such non-bankruptcy court (subsection (b)(3) and (c)). Subsections (b)(2), (b)(3), and (c) make it clear that chapter 15 is intended to be the exclusive door to ancillary assistance to foreign proceedings. The goal is to concentrate control of these questions in one court. That goal is important in a Federal system like that of the United States with many different courts, state and federal, that may have pending actions involving the debtor or the debtor's property. This section, therefore, completes for the United States the work of article 4 of the Model Law ("competent court") as well as article 9." House Report at 110.

[32] Section 1515(b): "A petition for recognition shall be accompanied by--
(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative."

[33] Foreign proceedings are defined at § 101(23) as follows: "(23) The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation."

Recognition of the foreign proceeding, however requires more than filing compliance. Chapter 15 contains the following definition: " 'recognition' means the entry of an order granting recognition of a foreign main proceeding or foreign nonmain proceeding under this chapter." § 1502(7). The foreign proceeding, then, must be either a foreign main proceeding or foreign nonmain proceeding. Those are defined terms as well, in sections 1502(4) and 1502(5):

> (4)"foreign main proceeding" means a foreign proceeding pending in the country where the debtor has the center of its main interests;

> (5) "foreign nonmain proceeding" means a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment;

One additional definition is relevant to the eligibility of a foreign nonmain proceeding. Section 1502(2) provides that " 'establishment' means any place of operations where the debtor carries out a nontransitory economic activity." The Bankruptcy Code does not define center of main interests. The meaning of both establishment and center of main interests is explored below.

**C.    Eligibility requirements for Chapter 15 Recognition**

The conditions for recognition of a foreign proceeding, implied in the definitions, are explicitly applied in section 1517. Section 1517 provides as follows:

> **§ 1517.  Order granting recognition**
>
> (a) Subject to section 1506 [public policy provision], after notice and a hearing, an order recognizing a foreign proceeding shall be entered if-

---

Foreign representative is defined at § 101(24) as follows: (24) "The term 'foreign representative' means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."

"§ 1516(a) If the decision or certificate referred to in section 1515(b) indicates that the foreign proceeding is a foreign proceeding and that the person or body is a foreign representative, the court is entitled to so presume.

(b) The court is entitled to presume that documents submitted in support of the petition for recognition are authentic, whether or not they have been legalized."

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
(2) the foreign representative applying for recognition is a person or body; and
(3) the petition meets the requirements of section 1515.

(b) Such foreign proceeding shall be recognized
(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or
(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

Section 1517 distills to the following list of findings necessary to grant recognition:

1. There is a foreign proceeding (as defined in § 101(23));

2. The foreign representative is a person or body (as defined in § 101(24));

3. The petition for recognition meets the requirements of § 1515;

4. The foreign proceeding is a foreign main proceeding or a foreign nonmain proceeding (as defined in §§ 1502(4),(5)).

The Foreign Proceedings and the Foreign Representatives satisfy the definitional requirements of sections 101(23) and 101(24) and the petition for recognition complies with the requirements of section 1515. Decision at 7. Nonetheless, recognition also requires that the Foreign Proceedings be either foreign main proceedings or foreign nonmain proceedings, i.e. that they be in a country where the debtor has its center of main interests or an establishment. § 1517(a)(1). This requirement raises the eligibility bar to require more of a jurisdictional basis in the foreign country than was required by former section 304.

Under section 304, "foreign proceedings," as previously defined, were eligible for bankruptcy court assistance. But unlike that of chapter 15, the prior definition included foreign proceedings whose jurisdiction was based solely on the presence of assets or domicile in the foreign country. By changing the definition of foreign proceedings to

12

remove asset and domicile-based proceedings, Congress elevated the required level of
jurisdictional connection between the debtor and the foreign country necessary to gain
access to ancillary proceedings.  The revised definition, blacklined against the prior
version, is as follows:

> § 101(23):   The term ``foreign proceeding" means ~~proceeding, whether~~ a
> collective judicial or administrative ~~and whether or not under
> bankruptcy law, in a foreign country in which the debtor's domicile,
> residence, principal place of business, or principal assets were located
> at the commencement of such proceeding, for the purpose of
> liquidating an estate, adjusting debts by composition, extension, or
> discharge, or effecting a~~ proceeding in a foreign country, including an
> interim proceeding, under a law relating to insolvency or adjustment of
> debt in which proceeding the assets and affairs of the debtor are subject to
> control or supervision by a foreign court, for the purpose of reorganization
> or liquidation.

As revised and augmented by the definitions of foreign main proceedings and
foreign nonmain proceedings, the foreign jurisdictional basis must now be either the
debtor's center of main interests or an establishment; as we explain below, these terms
equate to the debtor's principal place of business or a place where the debtor conducts
business operations.

The House Report confirms the significance of the revisions:

> The drafters of the Model Law understood that only a main proceeding or
> a non-main proceeding meeting the standards of section 1502 (that is, one
> brought where the debtor has an establishment) were entitled to
> recognition under this section. The Model Law has been slightly modified
> to make this point clear by referring to the section 1502 definition of main
> and non-main proceedings, as well as to the general definition of a foreign
> proceeding in section 101(23). A petition under section 1515 must show
> that the proceeding is a main or a qualifying non-main proceeding in order
> to obtain recognition under this section. [34]

In the case of foreign main proceedings, the Guide specifically excludes
consideration of alternative criteria other than the location of the debtor's COMI:

---

[34] House Report at 114.

LIBC/3162980.6

It is not advisable to include more than one criterion for qualifying a foreign proceeding as a main proceeding and provide that on the basis of any of those criteria a proceeding could be deemed a main proceeding. An approach involving such a "multiple criteria" would raise the risk of competing claims from foreign proceedings for recognition as the main proceeding.[35]

## D.     Proof of eligibility

Appellants ostensibly concur with the statutory requirements for recognition. AOB at 22.  However, they argue that the determination whether the Foreign Proceedings meet those statutory requirements – whether they are foreign main proceedings or foreign nonmain proceedings, and consequently whether they are eligible for recognition -- should be guided by principles of comity and considerations of creditors' expectations. AOB at 15-20, 23-25.  The point of their argument is to seek recognition for Foreign Proceedings that are pending in a country in which the Foreign Debtors have neither their COMI nor an establishment by saying that application of those terms is informed by comity and flexibility.  Their argument relies in part on repealed section 304 and general comity jurisprudence and in part on Judge Drain's decision in the *SPhinX* case, including his comment that "one generally should defer …to the creditors' acquiescence in or support of a proposed COMI…"  AOB at 23 (citing *SPhinX*, 351 B.R. at 117, 120).  As we show below, the Appellant and Judge Drain are wrong in viewing chapter 15 eligibility through the lens of comity.[36]

With respect, the court in *SPhinX* did not perceive the basic structural changes that Chapter 15 has made in our process of cooperation with foreign courts.   Instead, it assumed that the goal of ever greater international cooperation must necessarily mean even greater judicial discretion, dropping the restrictions of section 304(c) without

---

[35] Guide at ¶ 127.
[36] Judge Drain also goes awry in separating "recognition" as a preliminary step to determining whether the foreign proceedings are main or nonmain.  *SPhinX*, 351 B.R. at 115.  The Guide makes clear that there is a **single** recognition decision:  "The decision includes a determination whether the jurisdictional basis on which the foreign proceeding was commenced was such that it should be recognized as a "main" or a "non-main" foreign insolvency proceeding."  Guide at ¶ 30.  The Bankruptcy Court followed this guidance:  "In other words, the recognition must be coded as either main or nonmain."  Decision at 6 (citing House Report at 114).

creating any new guidance for judicial decision. Yet it is evident from the text of chapter 15, as well as the legislative history, that the new international consensus, adopted by Congress in chapter 15, makes recognition the central procedure in the process of cooperation. The misunderstanding reflected in the *SPhinX* dicta is most clearly revealed in the opinion's statement that little turns on the determination whether the foreign proceeding is main or nonmain.[37]  In fact, a host of important consequences ride on that determination,[38] which is the reason that a finding that the foreign proceeding is main or nonmain is explicitly required as part of the recognition process[39] and the recognition process is explicitly pre-requisite to the granting of relief to the foreign representative.[40] The court's misapprehension of this fundamental point exemplifies the difficulties with the picture of chapter 15 drawn by the dicta in *SPhinX*.

In contrast, Judge Lifland's view of the recognition requirements is correct: "Chapter 15…imposes a rigid procedural structure for recognition of foreign proceedings as either main or nonmain and thus the jurisprudence developed under section 304 is of no assistance in determining the issues relating to the presumption for recognition under chapter 15." Decision at 15.

1.    **Plain Meaning**

The plain language of section 1517 is objective. "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. [The Supreme Court has] stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503

---

[37] *SPhinX*, 351 B.R. at 114-15.

[38] For example, recognition as a main proceeding triggers the automatic stay of section 362 and provides very broad relief under section 1521 thereafter. By contrast, recognition of a proceeding as nonmain does not produce any stay automatically and the further relief available is limited to assets closely connected to the nonmain jurisdiction. § 1521(c). Another example is that only recognition of a foreign main proceeding limits the scope of a subsequently filed United States plenary bankruptcy. § 1528. Section 1523 gives broad standing to a main foreign representative to bring avoiding actions while limiting the right of a nonmain representative to bring such actions. Section 1530 generally requires that any relief granted to a nonmain proceeding must be made consistent with that given to a main proceeding, giving primacy to the main proceeding.

[39] 11 U.S.C. § 1517.

[40] 11 U.S.C. §§ 1520-21. Of course, temporary relief to maintain the status quo is available pending recognition. 11 U.S.C. § 1519.

U.S. 249, 253-54 (1992) (citing *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241-242 (1989); *United States v. Goldenberg*, 168 U.S. 95, 102-103 (1897); *Oneale v. Thornton*, 10 U.S. 53, 68 (1810)); *Boatswain v. Gonzales*, 414 F.3d 413, 417 (2d Cir. 2005); *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 189 (2d Cir. 2001). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' " *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992) (citing *Rubin v. United States*, 449 U.S. 424, 430 (1981); *Ron Pair Enterprises, supra*, 489 U.S., at 241); *Boatswain v. Gonzales*, 414 F.3d 413 at 417.

The words "center of main interests" cannot plausibly be construed as "place of incorporation" or "place as to which no objection is made." Nor can the procedural device of starting with the place of incorporation as a presumptive COMI be used to rewrite the COMI definition. See parts 5 and 6, below.

**2.      Legislative History**

If the plain meaning of sections 1502, 1515, and 1516 were not plain enough, the House Report confirms the shift away from subjective section 304 factors to the new objective test of chapter 15:

> This section closely tracks article 17 of the Model Law, with a few exceptions. **The decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by section 304(c) of the Bankruptcy Code.** The requirements of this section, which incorporates the definitions in section 1502 and sections 101(23) and (24), are all that must be fulfilled to attain recognition. [41]

The Guide makes the point even more directly:

> **Approaches based purely on the doctrine of comity** or on *exequatur* **do not provide the same degree of predictability and reliability** as can be provided by specific legislation, such as the one contained in the Model Law, **on** judicial cooperation, **recognition of foreign insolvency**

---

[41]   House Report at 113 (emphasis added).

**proceedings** and access for foreign representatives to courts. (emphasis supplied). [42]

All of these sources of guidance to the application of section 1517 emphasize its objectivity and preclude resort to subjective factors. Section 1509, **_Right of direct access_** complements this point. While permitting a foreign representative to proceed directly in the bankruptcy court to request recognition, it conditions further court access and relief on recognition having been granted. In so doing, it makes clear that comity comes into play *after* recognition and not for purposes of determining recognition:

> § 1509 (b):    **If the court grants recognition** under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter—

> (3):    **a court in the United States shall grant comity** or cooperation to the foreign representative.

Further, section 1509 permits the bankruptcy court to specifically enter orders aimed at limiting the foreign representative from seeking comity. § 1509(d).[43] These limitations comport to the strict eligibility requirements discussed above. The House Report elaborates:

> Although a petition under current section 304 is the proper method for achieving deference by a United States court to a foreign insolvency proceeding under present law, some cases in state and Federal courts under current law have granted comity suspension or dismissal of cases involving foreign proceedings without requiring a section 304 petition or even referring to the requirements of that section. Even if the result is correct in a particular case, the procedure is undesirable, because there is room for abuse of comity. Parties would be free to avoid the requirements of this chapter and the expert scrutiny of the bankruptcy court by applying directly to a state or Federal court unfamiliar with the statutory requirements. Such an application could be made after denial of a petition under this chapter. This section concentrates the recognition and

---

[42] Guide at ¶ 16.

[43] <u>§ 1509 Right of direct access</u>: "(d) If the court denies recognition under this chapter, the court may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States."

LIBC/3162980.6

deference process in one United States court, ensures against abuse, and empowers a court that will be fully informed of the current status of all foreign proceedings involving the debtor.

Subsection (d) has been added to ensure that a foreign representative cannot seek relief in courts in the United States after being denied recognition by the court under this chapter. [44]

## E.    Congress intended only a rebuttable evidentiary "presumption"

The Appellants argue that chapter 15 was intended to create a streamlined process for recognition (*true*) but that the "Bankruptcy Court's refusal to grant recognition and comity to the Foreign Proceedings frustrates chapter 15's goals by turning what is intended to be a simple and streamlined legal proceeding into a complex, cumbersome, and time consuming process" (*false*). AOB at 4. The Bankruptcy Court followed the streamlined process contemplated by chapter 15; it just did not lead to the result desired by Appellants. The basic rules governing presumptions are discussed below. This section deals specifically with the purpose and extent of the presumption in chapter 15.

The Foreign Representatives suggest that part of the streamlining, the presumption that the debtor's registered office is also its COMI, cannot be rebutted by evidence that the COMI is elsewhere. This is in direct contradiction to the holding of the court in *Tri-Continental:* "if the foreign proceeding is in the country of the registered office, and if there is evidence that the center of main interests might be elsewhere, then the foreign representative must prove that the center of main interests is in the same country as the registered office." 349 B.R. at 635. To make this argument, they create a haze of comity infused with an inverted characterization of cases under the European Union Convention on Insolvency Proceedings (the "EC Regulation").[45] True, there is a presumption that the Foreign Debtors' country of registration is their center of main interests. § 1516(c). But section 1516(c) provides as follows:

---

[44]  House Report at 110.

[45]  The Guide makes periodic references to provisions the EC Regulation that are antecedent to Model Law provisions and provide a reference point for harmonization. Guide at ¶¶ 19, 31, 73. The European Union Convention on Insolvency Proceedings was adopted as Council Regulation (EC) No. 1346/2000 of 29 May 2000 on Insolvency Proceedings, Off. J.L. 160/1 (2000) [hereinafter *E.U. Regulation*] (available at www.eu.int/eur-lex/pri/en/oj/dat/2000/l_160/l_16020000630en00010018.pdf).

**§ 1516.  Presumptions concerning recognition.**
( c )    In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests.

The presumption only holds, however, "[i]n the absence of evidence to the contrary." *Id.*  Appellants acknowledge this provision but seek to transform it to an invitation to consider comity and the expectations of creditors (or at least their uncorroborated view of those expectations) instead of evidence that the COMI is in another country.  AOB at 22-25 ("In sum, in considering whether to recognize foreign insolvency proceedings under chapter 15, courts and commentators agree that, in ruling on recognition, a Bankruptcy Court should heed the goals of respecting international comity and meeting the reasonable expectations of creditors." (footnote omitted)).  This assertion leads them to the mistaken conclusion (after a detour into the *Eurofood* decision, discussed below) that the bankruptcy court wrongfully "declined to honor the COMI presumption because there were no objections filed, creditors and investors should have expected Cayman law to control the debtors' insolvency proceedings and the debtors, as hedge funds have "no 'operations' in the traditional sense." AOB at 30.

But for the bankruptcy court dicta in *SPhinX*, there is no support for the Appellants' assertions.  The House Report advises that the presumption that the place of the debtor's registered office is its COMI "is included for speed and convenience where there is no serious controversy." House Report at 113.  It makes clear that the ultimate burden of proof on COMI is on the foreign representative. *Id.* at 112, 113; *see also Tri-Continental*, 349 B.R. at 635.  As the court held in *Tri-Continental*:

> Congress chose to substitute "evidence" for "proof" and otherwise to adopt the Model Law provision word-for-word. The explanation was that the substitution conformed to United States terminology and made clear that the burden of proof of "center of main interests" is on the foreign representative who is applying for recognition of a foreign proceeding as a main proceeding. Fn 8. This comports with the concept of a rebuttable presumption for purposes of Federal Rule of Evidence 301. [46]

---

[46] 349 B.R. at 635.  Footnote 8 in *Tri-Continental* contains the following excerpt from the House Report, at 112-113:

This change is especially important in light of the emphasis in the legislative history that no changes were made from the Model Law text except as were considered necessary and important.[47]

Article 16 of the Model Law is otherwise nearly identical to § 1516(c). The Guide explains both the limitations on the presumption and the propriety of the court's role in questioning it:

> Article 16 establishes **presumptions** that allow the court to expedite the evidentiary process; at the same time they **do not prevent**, in accordance with the applicable procedural law, calling for or **assessing other evidence if the conclusion suggested by the presumption is called into question by the court** or an interested party.[48]

Judge Lifland found evidence to the contrary in the Foreign Representatives' own submissions and properly relied on it to deny recognition as either a foreign main proceeding or a foreign nonmain proceeding. Decision at 11.

**F.    The section 1516 presumption is no more powerful than other rebuttable evidentiary presumptions**

The appellants' entire argument rests upon a claim that the evidentiary presumption in section 1516(c) carries the day unless some objecting party rebuts it. But it is settled that the burden of persuasion is on the petitioner for affirmative relief. "[T]he ordinary default rule [is] that [petitioners] bear the risk of failing to prove their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (citing 2 J. Strong, McCormick

---

"Although sections 1515 and 1516 are designed to make recognition as simple and expedient as possible, the court may hear proof on any element stated. The ultimate burden as to each element is on the foreign representative, although the court is entitled to shift the burden to the extent indicated in section 1516. The word "proof" in subsection (3) has been changed to "evidence" to make it clearer using United States terminology that the ultimate burden is on the foreign representative. "Registered office" is the term used in the Model Law to refer to the place of incorporation or the equivalent for an entity that is not a natural person. The presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy."

[47] The House Report specifically states that the drafters sought to remain as close to the original language of the Model Law as they could. *See* House Report at 106. Any change was made for a reason. *See, e.g., id.*

[48] Guide at ¶ 122 (emphasis added).

on Evidence § 337, p. 412 (5th ed. 1999)).[49] If a petitioner does not meet this burden, then the judge is obligated to rule against him.

As shown above, Title 11 U.S.C. § 1516(c) creates no more than a rebuttable evidentiary presumption.[50] Such a presumption at no time relieves a petitioner of its burden of proof/risk of non-persuasion. Fed. R. Evid. 301. It merely imposes "[up]on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption" and even then only does so in the event that a prima facie case is actually established by the petitioner. *Id.*; *County Court of Ulster County v. Allen*, 442 U.S. 140, 157 (1979) (permissive inference or deduction allows, but does not require, trier of fact to infer or deduce elemental fact from proof of basic fact and places no burden of any kind on opponent). That rule is especially cogent where, as here, Congress changed the relevant language of the Model Law by substituting rebuttal by "evidence" to the contrary for the Model Law's "proof" to the contrary.[51]

Notwithstanding the operation of a presumption, if the court concludes that a question of fact still remains (i.e., no prima facie case was made), the judge must decide whether the burden of proof is met. Cochit & Poehner, Fed. Courtroom Evid. § 301 (5th ed. 2007); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509-510 (1993). In such a situation, an opponent need not produce any evidence to rebut the presumption. *St. Mary's*, at 510 n.3. Thus, Judge Lifland could have denied relief despite a lack of any "evidence to the contrary" by determining that a prima facie case had not been made.

Even if a prima facie case was actually made, "[an] opponent need not prove the contrary of the fact but simply introduce some evidence to contradict the proponent's evidence." Wright & Graham, 21B Fed. Prac. & Proc. Evid.2d § 5122 (2007) (emphasis added) (citing 1 Mueller & Kirkpatrick, Federal Evidence, 2d ed.1994, p. 318); *St. Mary's*, at 510 n.3. "[T]he burden of proof as to the "center of main interests" is never on

---

[49] *See also* C. Mueller & L. Kirkpatrick, Evidence § 3.1, p. 104 (3d ed. 2003) ("Perhaps the broadest and most accepted idea is that the person who seeks court action should justify the request, which means that the plaintiffs bear the burdens on the elements in their claims".)

[50] *Tri-Continental.*, 349 B.R. at 635.

[51] *Id.*

the party opposing "main" status[;]...such an opponent has only a burden of going forward to adduce some evidence inconsistent with the registered office warranting a conclusion of "main" status. *Tri-Continental*, 349 B.R. at 635 (citing Fed. R. Evid. 301). Moreover, a party may be relieved of the burden imposed upon him by the fact that the necessary proof is introduced by his adversary. *Kilian v. Stackpole Sons, Inc.*, 98 F.Supp. 500, 506 (M.D. Pa. 1951) (quoting *Otto v. Western Saving Fund Soc.*, 23 A.2d 462, 465 (Pa. 1942)); 29 Am. Jur. 2d *Evidence* § 158 (2007). Sufficient evidence was provided by Appellants in their own pleadings.[52]

Furthermore, Judge Lifland exercised his right pursuant to Fed. R. Evid. 614 to *sua sponte* examine witnesses. This kept the judge from being "imprisoned within the case as made by the parties." Fed. R. Evid. 614(a) advisory comm. note. Such judicial action may be especially required "where counsel have omitted important evidence or where their presentation of evidence is confusing, misleading, or otherwise requires clarification." 29 Fed. Prac. & Proc. Evid. § 6232; *United States v. DiTomasso*, 817 F.2d 201, 221 (2d Cir. 1987) (Justifying the questioning of witnesses, the court stated, "The trial court's participation in litigation is not restricted to that of a mere umpire or referee," and, "[T]he court has a responsibility to see that issues are clearly presented...." (citing *United States v. Vega*, 589 F.2d 1147, 1152 (2d Cir. 1978)).

## G.    Neither of the Foreign Proceedings is a foreign main proceeding because the Foreign Debtors' center of main interests is in the United States

A "foreign main proceeding", as defined in § 1502, "means a foreign proceeding pending in the country where the debtor has the center of its main interests." This definition is taken from the Model Law. House Report at 107. In explaining the Model Law's adoption of the COMI terminology, the Guide acknowledges that it originated with the EC Regulation:

> A foreign proceeding is deemed to be the "main" proceeding if it has been commenced in the State [country] where "the debtor has the centre of its main interests." This corresponds to the formulation in article 3 of the

---

[52] *E.g.*, ROA-2 at ¶ 1, 3, 9; ROA-11 at ¶ 28.

LIBC/3162980.6

European Union Convention on Insolvency Proceedings, thus building on the emerging harmonization as regards the notion of a "main" proceeding. The determination that a foreign proceeding is a "main" proceeding may affect the nature of the relief accorded to the foreign representative.[53]

While neither chapter 15 nor the Model Law define "center of main interests," the EC Regulation comes close in ¶ 13: "The 'centre of main interests' should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." The Appellants devote some attention to the EC definition and its application by courts within the EC but present an incomplete and ultimately distorted picture. AOB at 24-25. The one bankruptcy court decision that addresses the determination of COMI, other than the bankruptcy and district court decisions in *SPhinX* and the Decision in this case, specifically discusses the EC Regulation language and properly equates it to the United States' concept of "principal place of business." *Tri-Continental*, 349 B.R. at 629. In *Tri-Continental*, the court found that debtor's principal place of business was in St. Vincent and the Grenadines ("SVG") and recognized an SVG liquidation as a foreign main proceeding. *Id.* at 640. However, all of the debtor's twenty employees, its lead underwriter, and its principal worked in the SVG and its only office was there.[54] A sun-kissed island can be a debtor's COMI, but in this case it is not.

Judge Lifland's Decision follows the "principal place of business" interpretation in a discussion that cites both *Tri-Continental* and the European Court of Justice ("ECJ") *Eurofood* opinion. *See* Decision at 10 (citing Case C-341/04, *In re Eurofood IFSC Ltd.*, 2006 E.C.R. I-3813, ¶ 34-35 ("*Eurofood*")). Appellants also discuss *Eurofood* and other European Community authority in an awkward effort to circumnavigate the Foreign Debtors' United States COMI in this case. AOB at 24, 26-27. By an array of selective references, Appellants essentially argue that *Eurofood* supports their view that "the creditors' expectations" should be honored in determining COMI. AOB at 25. Their

---

[53] Guide at ¶ 31.The Guide repeats the point at ¶ 72.
[54] *Tri-Continental*, 349 B.R. at 630. In addition, all of the money it collected was sent to and endorsed there. *Id.*

portrayal of *Eurofood* at AOB 27 bears repeating so that it can be contrasted with the
actual decision:

> The ECJ stressed the importance of the COMI presumption that an entity's
> registered office is its COMI, explaining that the interests of legal certainty
> and foreseeability require courts to apply criteria that are "objective and
> ascertainable by third parties…" **The fact that an Italian company
> controlled Eurofood or made economic choices on its behalf was not
> enough to rebut the COMI presumption.** One of the primary reasons the
> Bankruptcy Court found COMI to be located in the U.S. in this case,
> however, was for this very reason – appropriately rejected in *Eurofood* –
> that the investment manager, BSAM, which made investment decisions on
> behalf of the Foreign Debtors, was located in the U.S.[55]

*Eurofood* did not choose the presumed "place of registration" COMI in the face of
evidence that Eurofood's business decisions were made elsewhere. Instead, **the ECJ
ruled that Eurofood's COMI was in the country where it was both registered and
conducted its business operations**; the ECJ held that the fact that Eurofood's parent
company, which was in another country, could influence its decisions did not support a
finding that Eurofood's COMI was in the parent's country. Eurofood was a financing
subsidiary with one major creditor, Bank of America, and their dealings were in Ireland,
its place of registration.

*Eurofood* resolved a tug of war between Irish and Italian courts over insolvency
proceedings of Eurofood IFSC Ltd. by ruling on questions submitted by the Irish
Supreme Court. *Eurofood*, ¶¶ 22-24. Everything that the ECJ said in Eurofood was
premised on the stipulated fact that the debtor was both registered and conducting its
business in Ireland:

> The referring court asks how much relative weight should be given as
> between, on the one hand, **the fact that the subsidiary regularly
> administers its interests, in a manner ascertainable by third parties
> and in respect for its own corporate identity, in the Member State
> where its registered office is situated** and, on the other hand, the fact that

---

[55] AOB at 27 (citations omitted) (emphasis added).

LIBC/3162980.6

the parent company is in a position, by virtue of its shareholding and power to appoint directors, to control the policy of the subsidiary. [56]

Contrast the above facts with the Appellants' characterization: "The Irish court determined that Eurofood's COMI was in Ireland, where insolvency actions were initiated, based on the fact that Eurofood's registered office was there." AOB at 27. *Eurofood* supports Judge Lifland's determination that the principal place of business trumps the place of registration in determining COMI.

Appellants' brief neglects to mention that the key determinant is where the debtor administers its interests and plucks the "objective and ascertainable by third parties" language out of context to elevate the presumption above the evidence. As detailed above and in the Decision, the "objective factors ascertainable by third parties" in the case of the Foreign Debtors actually demonstrate that their COMI was in New York where their investment manager, administrator, and prime broker are located (and all of their funds were held until the post-filing diversion discussed above). ROA-12 at 29:9-19; ROA-2 at 4.

Appellants further mistakenly assert that other European courts "have followed suit," where suit is "heed[ing] the goals of respecting international comity and meeting the reasonable expectation of creditors"--apparently regardless of evidence of the location of the COMI. AOB at 24, 25. Ironically, they cite to the Daisytek case as the "other European court" authority. AOB at 24; *In re Daisytek-ISA Ltd.*, [2003] All E.R. (D) 312 (Ch. May 16, 2003) (J. McGonigal, J.). Appellants' citation is to the English case that opened main proceedings for French-registered subsidiary of Daisytek, not to the subsequent French decisions that involved a French challenge to the English COMI determination. *Daisytek*, like *Eurofood*, dealt with dueling COMI determinations.

The ruling of the French appeals court, overturning a lower court challenge to the propriety of the COMI determination in the English Daisytek case, supports Judge

---

[56] *Eurofood*, ¶ 27. (emphasis supplied)

LIBC/3162980.6

Lifland's Decision.  The Court of Appeal of Versailles ruled that the COMI of a French Daisytek subsidiary was in England because it was managed from there.[57]

## H.    Nonmain Proceedings – The Lack of an Establishment in the Islands

## 1.    Context

As noted above, although chapter 15 and the Model Law were designed to expand and improve upon the relief that could be obtained by a foreign representative, the necessary correlative reform was the introduction of stricter requirements for recognition of both main and nonmain proceedings and a much more structured approach to recognition procedure in which every proceeding that receives judicial assistance in the United States must be either a main or a nonmain proceeding.  § 1517.  Comity in bankruptcy matters was no longer a rather undefined deference to be granted or denied by each American court confronted by a request for it, but was channeled through the federal courts by way of a recognition procedure under chapter 15.  § 1515(a); House Report at 110; Guide at ¶ 175.  Consistent with the compelling need for uniformity among countries adopting the Model Law, Congress not only adopted a center of main interests test for main proceedings but also required an *economic* presence in a jurisdiction as a condition for recognition of even a nonmain proceeding.  § 1502(2).  That is, a bankruptcy proceeding in a jurisdiction that did not host an economic activity—and a "nontransitory" one at that—would not receive recognition at all.[58]  House Report at 107 n.107; *see* § 1517; Model Law art. 2(c); Guide at ¶¶ 73, 75, 128.

---

[57] *SAS ISA Daisytek*, [CA] [regional court of appeal] Versailles, Sept. 4, 2003, 05038 ("Daisytek (FR)")  The Commercial Court of Pontoise put the French subsidiary into administration after the English court had opened main proceedings, emphasizing SAS Daisytek's French registration and separate legal existence.  The French appellate court deferred to the English court because it agreed that the French subsidiary was operated from England.  *Id.*

[58] Of course, that does not mean that foreign civil proceedings cannot be recognized with regard to specific assets or other specific purposes.  For example, a foreign judgment might serve as the basis for a finding of res judicata or collateral estoppel in a United States bankruptcy case or proceeding.  *Tri-Continental*, 349 B.R. at 630.  In addition, all of the money it collected was sent and endorsed there.  *Id.*

A nonmain proceeding is defined as:

> . . . a foreign proceeding, other than a foreign main proceeding, pending in
> a country where the debtor has an establishment.[59]

In turn, an establishment is defined as:

> any place of operations where the debtor carries out a nontransitory
> economic activity.[60]

The distinguished bankruptcy judge in this case, himself someone who was closely involved in the development of the Model Law on which chapter 15 is based, captured the purpose of the law succinctly:

> While much of the jurisprudence developed under section 304 is preserved
> in the context of new section 1507, section 304 did not have a recognition
> requirement as a first step.  Moreover, the eligibility requirements of
> section 109 of the Bankruptcy Code (entitled "Who may be a debtor"), did
> not apply to section 304 but are very specific as to who qualifies for relief
> under each of the other chapters of the Bankruptcy Code.   Section 304
> simply gave the United States courts the authority to open an ancillary
> proceeding and grant various broad forms of relief to the foreign
> representative.  See *In re Culmer*, 25 B.R. 621, 624 (Bankr. S.D.N.Y.
> 1982).  Chapter 15, on the other hand, imposes a rigid procedural structure
> for recognition of foreign proceedings as either main or nonmain and thus
> the jurisprudence developed under section 304 is of no assistance in
> determining the issues relating to the presumption for recognition under
> chapter 15.[61]

## 2.    Plain Meaning

Analysis must start with the striking fact that there is no presumption in favor of the existence of an establishment in the debtor's country of incorporation, not even the weak evidentiary presumption applicable to COMI.  Instead, the court must make the factual finding that the alleged nonmain proceeding is in a jurisdiction where the debtor had operated an establishment "within the meaning of section 1502."[62]  The statutory requirement of an establishment that conducts "operations" involving a reasonably

---

[59] 11 U.S.C. § 1502(5).
[60] 11 U.S.C. § 1502(2).
[61] Decision at 16-17.
[62] 11 U.S.C. § 1517(a)(1), (b)(2).

LIBC/3162980.6

permanent ("nontransitory") "economic activity" presents as clear a case of plain meaning as one could imagine.

No ordinary English speaker would think of "certain auditing activities" or preparation of incorporation papers, when performed by a third party, as "operations" much less "economic activity."[63]  Indeed, the very word "establishment" in a business context suggests a business office or a place for the provision of goods and services by that party.[64]  Even the alleged review of insider transactions does not fall within the ordinary meaning of "economic activity."[65]  Thus even the facts alleged on appeal do not rise to the level necessary for a finding of an establishment in the Cayman Islands within the meaning of Chapter 15.

## 3.    Lack of possible relief

This plain meaning of the term "establishment" is reinforced by the other provisions of the statute and common sense.  At the time of the petition there were no assets of the funds in the Cayman Islands.[66]  In general, section 1521(c) of the Bankruptcy Code limits any recognition of a nonmain proceeding by the United States courts to assets located in the nonmain jurisdiction or closely connected thereto.[67]  Thus the Cayman Islands court had no legitimate work to do in the management of the financial distress of these funds.  By contrast, a proper plenary bankruptcy proceeding

---

[63] These are among the principal Cayman Islands activities offered by the appellants in support of the claim that the Cayman Islands qualify as a main or nonmain proceeding. Whatever limited range for local activities may be permitted by the Cayman Islands statutes, these funds did not exploit it.

[64] *E.g.*, Black's Law Dictionary 586 (8th ed. 1999): #2 An institution or place of business.  V Oxford English Dictionary, 405 (2d ed. 1989): #10. An organized staff of employees…a. A…house of business..

[65] AOB at 15.  It is not clear that the "independent" directors actually did review and approve such transactions, but that point, like all the post-hearing affidavits filed in this case, is de hors the record. Actual review by the supposedly independent local directors is not even alleged under oath and may not have happened. *See* n.23.

[66] *See* ROA-2 at ¶ 9.  At some time, uncertain in the record, some millions of dollars of cash (it is not clear how many millions) were transferred to those islands.  Decision at 3 n.1, 13 n.10; ROA-9 at 22:5-22; ROA-12 at 17:4-20.  The transfer was made after the petition for recognition was filed, since the petition recites that "all of High-Grade Funds' assets are managed by BSAM, and are within this judicial district." ROA-2 at ¶ 9.  It would be terrible public policy to encourage parties to engage in transfers of assets away from the United States in a belated attempt to permit recognition, or for any other purpose, without court approval.

[67] "in granting relief under this section to a representative of a foreign nonmain proceeding, the court must be satisfied that the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding." 11 U.S.C. § 1521(c).

brought in the American home of these funds would control the funds' principal assets. The worldwide jurisdiction of our bankruptcy courts[68] would then permit an orderly global winding up assisted by those foreign courts having actual jurisdiction over the foreign assets and economic operations of the debtors.

### 4.    Policy

Contradicting the statute's clear and specific requirements for recognizing a nonmain proceeding, the appellants attempt a policy argument. They make two unsupported claims. The first is that Congress has blundered in establishing the criteria for recognition because the process of recognition will become too difficult and cumbersome. AOB at 4. In fact, the statutory criteria are designed to be easily met by a proper petitioner. Guide at ¶ 28. Suppose these funds had a business office in London where employees regularly managed English assets. If an English liquidation proceeding were brought, a simple affidavit to that effect would demonstrate that the English proceeding was a "foreign proceeding," that the English liquidator was a "foreign representative," and that the English office performed nontransitory operations entitling the English proceeding to recognition as nonmain. Ordinarily the hearing on recognition, if any, would take half an hour. The English proceeding could then administer the English assets in coordination with the United States main proceeding under the English version of the Model Law.[69]

The appellants make wholly unsubstantiated claims that American bankruptcy proceedings are more costly and burdensome than a Cayman Islands case. AOB at 10. They offer no evidence, even on appeal, of the costs and burdens of either sort of proceeding. If the facts about comparative efficiency were in issue, recent empirical

---

[68] The United States is one of several countries that asserts worldwide jurisdiction over a debtor's property. 28 U.S.C. § 1334(e) 1) (jurisdiction over the debtor's property "wherever located."); *see, e.g., In re McLean Industries, Inc.,* 76 B.R. 291, 296 (Bankr. S.D.N.Y. 1986). *See generally,* 1-3 Collier on Bankruptcy ¶ 3.01(5) (citing *Hong Kong & Shanghai Banking Corp. v. Simon (In re Simon),* 153 F.3d 991 (9th Cir. 1998) , *cert. denied,* 525 U.S. 1141 (1999)); Elizabeth Warren and Jay Lawrence Westbrook, The Law of Debtors and Creditors, Chapter 10 (5th Ed. 2006).

[69] The Cross Border Insolvency Regulations, 2006, S.I. 2006/1030 (U.K.).

work strongly suggests that American bankruptcy courts are in fact quite efficient.[70] Amici are not aware of any empirical study of Cayman Islands procedures. For foreign liquidators to come to the United States and announce that proceedings in other jurisdictions should control American companies because United States courts are incapable of efficient adjudication is highly presumptuous.

The factual findings of the court below should not be overturned unless they are "clearly erroneous." Fed. R. Bankr. Proc. 8013. Because the existence *vel non* of an "establishment" is such an intensely factual question, with no presumption in its favor, your amici have necessarily discussed the facts of this particular case. The larger point is that those purported foreign representatives who seek to invoke the considerable powers of an American federal court have a duty to make the necessary factual record under the terms of our statute. The lack of objection to a clearly unwarranted petition, brought by representatives of a jurisdiction obviously lacking any economic connection with the debtor, may result from any number of strategic considerations, lack of resources, or private arrangements. None of those relieves the bankruptcy court of its duty to apply the statute as written. As Judge Learned Hand commented a long time ago, "A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert." [71]

## V.    CONCLUSION

The effect of recognition of the petition in this case would be to void the Congressional effort to limit United States cooperation to countries with a real connection to the debtor. An injunction against lawsuits and collection efforts in the United States and a turnover of United States assets to a Cayman Islands proceeding would not only violate the statute, but would give that proceeding most of the relief Congress has reserved for main proceedings. Representatives from several other countries with some

---

[70] Elizabeth Warren and Jay Lawrence Westbrook, Chapter 11: Conventional Wisdom and Reality, Social Science Research Network (draft paper) (available at http://ssrn.com/abstract=1009242).

[71] *United States v. Marzano*, 149 F.2d 923, 925 (2d Cir. 1945) (although holding that on the facts of that case the judge should not have questioned the witness in the manner he did).

tenuous connection to a debtor might arrive in waves, each demanding the same relief. The careful, orderly, structured procedure adopted by Congress would degenerate into a struggle without rules or guidance for the courts to follow.

These concerns are especially great where, as here, the debtors are in fact American companies in every economic sense.  These companies and dozens of others like them are at the center of a growing economic storm in the United States.  They are also the center of an important public debate about the desirability *vel non* of increased regulation or oversight of subprime lending and of certain kinds of investments, especially in the context of market imperfections.  It is appropriate, even necessary, that their liquidation take place in American courts, supervised by American judges, and under the observation of American investors and our financial media.  New York is the center of the financial world and should be the center of judicial management of the current crisis involving United States funds.

31

For all of the reasons set forth above, the Decision and Order Denying Recognition of Foreign Proceedings should be affirmed.

### AMICI CURIAE

_/s/ Daniel M. Glosband_
Daniel M. Glosband (DG-1944)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109

Professor Jay L. Westbrook (*pro hac vice pending*)
University of Texas at Austin
727 East Dean Keeton Street
Austin, Texas 78705-3224

Professor Kenneth N. Klee (KK-5910)
UCLA School of Law
405 Hilgard Avenue
Law Building 1242
November 28, 2007                Los Angeles, California 90095-1476

LIBC/3162980.6

**EXHIBIT A**

## Relevant Publications by Jay L. Westbrook

*Locating The Eye Of The Financial Storm*, 32 Brook. J. Int'l L. 1019 (2007).

*Avoidance Of Pre-Bankruptcy Transactions In Multinational Bankruptcy Cases*, 42 Tex. Int'l L.J. 899 (2007).

*Multinational Financial Distress: The Last Hurrah Of Territorialism*, 41 Tex. Int'l L.J. 321 (2006) (Book Review).

*Chapter 15 and Discharge*, 13 Am. Bankr. Inst. L. Rev. 503 (2005).

*Chapter 15 at Last*, 79 Am. Bankr. L.J. 713 (2005).

The Duty to Seek Cooperation in Multinational Insolvency Cases, *in* The Challenges of Insolvency Law Reform in the 21st Century, (Peters, et al ed. 2006) (Geneva), reprinted in Ann. Rev. of Insolvency L. 2004 (Sarra ed. 2005) (Canada).

Multinational Enterprises in General Default: the UNCITRAL Model Law and Related Regional Reforms, *in* Aktuelle Entwicklungen des europäischen und internationalen Zivilverfahrensrechts (2002).

*A Global Solution to Multinational Default*, 98 Mich. L. Rev. 2276 (2000).

Jay L. Westbrook was also the United States Reporter for the Transnational Insovlency Project of the American Law Institute. *See* Am. L. Inst., Principles of Cooperation among the NAFTA Countries (2003).

## Relevant Publications by Daniel M. Glosband

Chapter 8, *Principles of American Jurisprudence Underlying the Treatment of Foreign Cases in the United States*; Chapter 9, *Cases under Chapter 15*; and Chapter 10, *Cooperation and Communication; Plenary Cross-Border Cases*, *in* Collier International Business Insolvency Guide, (2005). .

Chapter 19, *Foreign Proceedings*, *in* Collier Bankruptcy Practice Guide, (2006). .

Chapter 305, *Abstention*; Chapter 306, *Limited Appearance*; and separate chapters for each of the 32 sections of Bankruptcy Code Chapter 15, Ancillary and Other Cross-Border cases, *in* Collier on Bankruptcy (15th ed. 2004).

Co-Author Chapter 33, *Multinational Insolvencies*, *in* Chapter 11 Theory and Practice (Treatise), A Guide to Reorganization (1994). .

*Chapter 15: US Insolvency Reform Explained*, Int'l Fin. L. Rev.  (2005)..

*SPhinX Chapter 15 Opinion Misses the Mark*, 25 Am. Bankr. Inst. J. 44 (Dec./Jan. 2007).

33

*Bankruptcy Court Rejects Cayman Proceedings of Bear Stearns Hedge Funds*, 26 Am. Bankr. Inst. J. 38 (Oct. 2007).

Presentation: *Chapter 15; why is it ; what is it; and why you should care*, Federal Judicial Center Workshops for Bankruptcy Judges, April and August 2006, with Selinda Melnik, Esq., moderated by Honorable Stephen Raslavich, Bankruptcy Court, E.D. Penn.

## Relevant Publications by Kenneth N. Klee

*Sovereign Piracy*, (with Gaurang M. Gulati), 56 Bus. Law. at 635-51 (Feb. 2001) (reprinted in 3 Legal Scholarship Network: UCLA School of Law Research Paper Series (Sep. 12, 2001), also available at http://www.ssrn.com).

LIBC/3162980.6